No. 2616.

H. HENNING v. THE STATE.

1. PRACTICE—EVIDENCE—CHANGE OF VENUE was applied for by the accused upon an affidavit setting out the existence of such prejudice against him in the county of the forum as would deprive him of a fair trial. This affidavit was met by the State on affidavit impeaching the means of knowledge of the compurgators of the accused, and upon this issue the trial court permitted the State to call a witness and ask him "if there was sufficient prejudice against the accused in Tarrant county to prevent a fair trial." The defense objected to the question as not pertinent to the i sue. *Held*, that the evidence indicated was admissible as bearing upon the means of knowledge of the compurgators, and the objection was properly overruled.

2. SAME—CONTINUANCE is properly refused if, in view of the evidence on the trial, the absent testimony as disclosed in the application is either immaterial or is probably untrue. Note the statement of the case for such testimony set forth in an application for a continuance.

3. SAME—JURY LAW—BILL OF EXCEPTIONS reserved to the overruling of a challenge to a juror for cause, is not complete, nor will it be considered by this court if it neither shows that the juror served on the jury, nor that he was challenged peremptorily by the accused, and that an objectionable juror was forced upon the accused after his peremptory challenges were exhausted.

4. MURDER—SELF DEFENSE—CHARGE OF THE COURT—FACT CASE.—The evidence presenting only the conflicting theories of murder of the first degree on the one hand, and perfect self defense on the other, the trial judge correctly confined his charge to those two issues, and properly refrained from charging upon murder of the second degree and manslaughter. See the statement of the case for evidence held sufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Tarrant. Tried below before the Hon. R. E. Beckham.

The conviction in this case was in the first degree for the murder of R. W. Townsend, and the penalty assessed against appellant was a life term in the penitentiary.

G. H. Brown was the first witness for the State. He testified, in substance, that he lived in the city of Fort Worth on the third day of April, 1886, when the deceased was killed. He was then employed as yard master in the yards of the Gulf, Colorado & Santa Fe Railway Company. He then knew, and for some

time had known, the defendant.. The defendant, on April 3, 1886, was employed in the blacksmith shops of the Fort Worth & Denver City railway, in the said city of Fort Worth. The "strike" then existing did not involve the Fort Worth & Denver City railway. While at work in his yards early on the morning of April 3, 1886, the witness saw three or four men coming towards his yards from the direction of the Denver railway shops, which were situated a few blocks east of where the witness then was. They crossed the Santa Fe track on Seventeenth street, some sixty feet south of the witness, and proceeded west with said street towards Main street. All of the parties, save possibly one, carried Winchester rifles. Among the parties the witness recognized one Harden, one Nace, a one armed man called Pierce, and the defendant. The defendant had a gun. None of the parties spoke to witness, nor did witness speak to any of them. This was about ten o'clock in the morning. An hour or an hour and a half later the witness saw the coal train on the Missouri Pacific track pass through Fort Worth, going south, the sheriff of Tarrant county having his posse on board as train guards. When witness first saw the defendant and his companions, they were coming from the direction of a large crowd then congregated near the junction of the railway track, and near the Denver City railway shops. Witness did not see the defendant again until he was tried on habeas corpus for the killing of Townsend, at the cut, about three miles south of Fort Worth.

W. L. Dorsey testified, for the State, that, at the time of and during the "great strike" of 1886, he was employed as a clerk in the freight depot office of the Texas & Pacific railway company, in Fort Worth. While at work at his desk, on the morning of April 3, 1886, witness's attention was called to a squad of armed men who came into Main street from around the corner of Joseph H. Brown's building, on Seventeenth street. Five or six persons were in the crowd, all or nearly all of them carrying guns. Witness did not know all of the men, but recognized the defendant and Hardin, Nace and a one armed man named Pierce. Several of the clerks went to the depot doors and observed the crowd, but nothing was said by any of the clerks nor by any of the crowd. Witness then mounted a freight car on the track and watched the party in its progress south on Main street, until it disappeared over Tucker's hill. · Main street runs north and south. The Texas & Pacific railway depot was situated on the

east side of that street, a short distance from Joseph H. Brown's building. It was about eleven o'clock in the morning when witness saw the crowd as stated.

A. Bridgman and W. Morton testified substantially as did Dorsey as to the crowd passing the Texas Pacific depot and going south on Main street, but did not claim to know any of the parties.

F. J. Ray testified, for the State, that on April 3, 1886, he was train master for the Denison division of the Missouri Pacific railway. It was the business of the witness to order and direct the movements of trains on the said railroad, to and from Fort Worth. For some time previous to the said April 3, 1886, the movement of trains on said railway had been prevented by "strikers." On the morning of the said April 3, the witness directed that a coal train, to consist of an engine, a caboose and ten coal cars, should be made up at Hodge, a small station on the Missouri Pacific railway, about four miles north from Fort Worth, and proceed to Alvarado, a station on said road, about thirty miles south of Fort Worth. Engineer Ed. Smith was placed in charge of the engine, with C. E. Nicewarner as fireman. A posse of officers was placed upon the said train by the sheriff, at witness's request, to guard it in its passage from Hodge through Fort Worth and towards its destination at Alvarado. The train passed through Fort Worth about fifteen minutes after twelve on that day. It passed through Fort Worth without stopping. Within an hour the said train returned to Fort Worth, bringing the wounded officers Sneed, Fulford and Townsend. At a point about two and a half or three miles south of Fort Worth, the track of the Missouri Pacific railway is crossed by the track of the Fort Worth & New Orleans railway. The shooting was said to have occurred at that crossing.

W. T. Maddox, sheriff of Tarrant county, testified, for the State, that on the third day of April, 1886, he had under his orders a posse organized to suppress a riotous combination that, for several days, had been practically in possession of the Missouri Pacific railway yards in Fort Worth. This riotous combination had prevented the railway company from operating or moving its trains, by such means as "killing" the engines and uncoupling the cars. Witness was officially called upon to quell the disturbance, and his posse was organized for that purpose. For two or three days prior to the said third day of April witness had labored hard to protect the train men in the opera-

tion of the trains, and during that time he saw large crowds of strikers congregated in the yards, disabling trains, etc. On the morning of April 3 witness detailed a number of his posse to go to Hodge and board the south bound coal train, while he distributed the remainder of his posse in the railway yards. R. W., or "Dick," Townsend, was one of the posse detailed and sent to Hodge. The posse was placed on the train to guard it through Fort Worth and take it South. A crowd, consisting of at least a thousand men, congregated at and about the railway yards before the said coal train arrived, and as the train approached the yards, bound south, the said crowd rushed towards it with a "whoop." It was also "flagged" by a Mrs. Eagan and another woman, but it made no stop.

J. J. Fulford was the next witness for the State. He testified, in substance, that he was one of the detail of the sheriff's posse placed on the coal train at Hodge, on the fatal April 3. The said detail was ordered by the sheriff to escort the train through Fort Worth to the junction of the Missouri Pacific with the Fort Worth & New Orleans railway, at the "cut," about three miles south of Fort Worth. Witness boarded the said train at a point north of Fort Worth, and went with it through Fort Worth and to the junction. His position was on the running board of the engine, on the east side. When the train reached the yards in Fort Worth it was "flagged" by two women, but the train passed through the yards and the large body of strikers there collected, and moved south, without stopping. No obstructions were encountered until the train approached within about one hundred feet of the switch at the crossing of the Fort Worth and New Orleans railway, where it was discovered that the switch was thrown, and the train stopped. Witness did not see who threw the switch, but just as the train stopped he saw a party of four or five men standing near the switch, on the east side of the Missouri Pacific track. As soon as the train stopped, Officers Jim Courtright, Jim Thomason, Rufe James and Dick Townsend jumped off the engine and started towards the switch, by which time the parties near the switch started towards the train. Courtright and his party met them, placed them under arrest, and searched for arms, of which none were found. Courtright then placed Townsend in charge of the men, and with Thomason and James, started back towards the engine. Witness was then on the ground, just east of the engine. About the time that Courtright and his party started back towards the engine, the

witness, looking southeast from the engine, saw a party of five or six men, armed with Winchesters, squatted or kneeling behind a ravine, about seventy-five or one hundred yards from the engine. Their guns were pointed directly at the engine. Witness, seeing that the men were going to shoot, motioned his hand towards the ravine and called to them: "Gentlemen, don't shoot." Witness had not yet drawn his pistol. Witness had hardly uttered the words quoted, when the parties behind the ravine fired their first volley. Witness then began to scramble for a position on the other side of the engine, when a ball struck and broke both of his legs. He rolled over to the embankment, drew his pistol and commenced shooting. The witness saw the man Hardin fire the shot that struck him. The first shot fired was the one that struck witness. None of the officers, so far as witness saw or knew, drew their pistols until after the first volley was fired by the men in the ravine. Among the men who had guns and fired from the ravine, the witness recognized the defendant and Hardin, Nace and Pierce. The volley fired by the men at the officers opened the fight, and the firing became general. The officers had pistols only, which were not effective at the long distance between the contending forces, and the strikers had Winchesters. Witness and Officers Charley Sneed and Dick Townsend were wounded in the fight, Townsend dying on the same evening. The ground on the battle field sloped from west to east. There was a cut in the embankment, at a point immediately north of the switch. Part of the train was in that "cut" when the fight occurred. It was impossible for those on the engine to see the parties in the ravine until the engine passed through the cut. Townsend, when shot, was facing the men in the ravine. Witness was then in front of Townsend, lying on the ground, with both legs broken.

C. E. Nicewarner testified, for the State, that he was fireman on the ill fated coal train which left Hodge on the morning of April 3, 1886, bound for Alvarado. Twelve or fifteen officers, serving as an escort, were on board that train. Two women flagged the train on its passage through the yards, but it did not stop. Witness's position as fireman was on the east side of the tender. The cut mentioned by previous witnesses was about a train's length north of the switch at the crossing of the Fort Worth and New Orleans railway, three miles south of Fort Worth. When the train going south emerged from that cut, witness, looking southeast, saw five or six men intrenched be-

hind a ravine about two hundred yards distant. Some were kneeling, some lying down, and one was standing, all of them with Winchester guns bearing upon the engine. The train continued south until it reached a point about fifty feet north of the switch when it stopped, and witness saw that the switch had been thrown. He then observed four or five parties approaching the train from the direction of the switch. Courtright, Townsend, Thomason and James got off the engine on the west side, went to, arrested and searched the said five men, who were then placed in Townsend's charge. Courtright and Thomason then went towards the men in the ravine and called to them: "You will have to surrender." Instead of surrendering, however, the men in the ravine opened fire. At that time the officers had their pistols out and in their hands, but not one of them was presented. The officers returned the fire and the shooting became general. Townsend, while facing the ravine, at the head of the engine, was shot through the breast. During the fight some of the men crossed from the ravine to some piles of cross ties and nail kegs lying along the track of the Fort Worth and New Orleans track, and from that protection fired into the train. The fight lasted about ten minutes. The casualties to the posse showed officers Townsend, Sneed and Fulford wounded. They were placed on the train and taken to Fort Worth as soon as the fight was over. Had the train not stopped when it did the switch would have thrown it from the Missouri Pacific track to the Fort Worth & New Orleans track, and might have caused a derailment, or even a wreck. This witness was here shown a diagram of the battle ground, which he said he helped to make, and knew to be correct. It is as follows:

Statement of the case.

Explaining this diagram, the witness said that the track of the Missouri Pacific Railway ran north and south. The Fort Worth and New Orleans railway track crossed the same from northwest to southeast. The switch connecting the side track of the Fort Worth & New Orleans railway with the Missouri Pacific was a little south of the crossing. The coal train halted with the head of the engine near the crossing. When the train stopped, Townsend took charge of the men arrested at a point near the head and west of the engine, which point is marked on the diagram with a dot under a T. When the stop brakes were applied, the train "slacked back" eight or ten feet, throwing the rear end of the train into the cut. The six men with guns were in the ravine, southeast of the engine.

J. W. Thomason, J. P. Witcher, W. R. Tucker and A. C. Brandon, officers, and Ed Smith, engineer, on board the coal train, testifying for the State, gave the same general account of the fight as that given by previous witnesses, all of them swearing that, while the officers had their pistols in their hands when Courtright summoned the men in the ravine to surrender, none of them had their pistols presented at the party. All of them testified that the men in the ravine opened fire, except Smith, who said that he was engaged with his engine at the time and did not know which party fired the first shots.

David Stewart testified, for the State, that he witnessed the fight from a barn, on which he was at work, about three hundred yards distant from the railway track. A few minutes before the coal train reached the cut, he saw five or six men armed with Winchesters run to and take position in the ravine, and, while the train was passing through the cut, witness saw four or five men manipulating the switch near the crossing. The train stopped before reaching the crossing, and the five men who had manipulated the switch were arrested and searched by some men who got off the train. The firing soon opened, the first shots being fired by the men in the ravine.

John Stephens was the next witness for the State. He testified that he was deputy sheriff of Hill county, Texas. Early in July, 1886, witness met the defendant in Cleburne, Texas. Defendant then proposed to go home with witness, who lived in the country, to spend the night. In the course of the conversation defendant said that he was in the fight near Fort Worth, and would soon tell the witness all about it. Witness and defendant then looked up Doctor Douglas, in whose wagon wit-

ness came to town, and they got in the wagon with Doctor Douglas and started home. Defendant stayed with Doctor Douglas that night, and came to witness's house next day, and witness hired him to work for him. On the following day witness and the defendant went fishing, and on that day, and while fishing, defendant told witness about the fight. He said that they, referring to himself and those acting with him, received a telegram from Martin Irons, directing them to hold Fort Worth; that, acting upon that telegram, he and Hardin and Pierce and some others got Winchesters and took position in the ravine east of the crossing of the railroad track, their purpose being to stop the train; that they had left instructions with two women, one a Mrs. Eagan, to flag and stop the train on its passage through the yards and kill the engine, and that he, on the day before, showed Mrs. Eagan and the other woman how to kill an engine; and that it was understood that, if the women failed, he and his associates were to stop the train at the crossing; that the train stopped near the crossing, and some officers got off and arrested the men who threw the switch; that after arresting the men the officers started towards them and ordered them to surrender, and "for God's sake not to shoot;" that they fired upon the officers at once; that one of the officers fell, and Pierce asked him: "Who fired that shot?" that he replied, "I did;" that Pierce then said "By God, you got one of them!" He said that the officers had their pistols drawn when they called upon him and his party to surrender; that the man he shot was standing at the head of the engine, and was Sneed; that he, defendant, was the unknown man of the party; that the others were known and had been indicted, but that no bill had been found against him. The witness at once communicated the facts divulged to him by defendant to the officers of Hill and Tarrant counties.

Doctor Douglass testified, for the State, that when defendant, on the night stated by witness Stephens, stayed at witness's house, near Cleburne, he intimated to the witness that he was "on the dodge." Witness asked him what he was "dodging" for. He replied that he was in the fight of the strikers with the officers in the previous April. He said that since the fight he had been to Tennessee, Arkansas and the Indian Territory on foot.

J. H. Walker testified, for the State, that, on the tenth day of July, 1886, he met the defendant at a democratic primary meet-

ing in Covington, Hill county, Texas. In the course of conversation witness asked him about the fight near Fort Worth between the officers and the strikers. Defendant appeared embarrassed, and requested witness to say nothing about the fight at that time and place, as he was in it. He said, in effect, that he used a Winchester gun in the fight; that his party went to the crossing to stop the train; that he would have killed his man had he not hidden his head behind the rails, and that a ball passed through his own clothes.

The State closed.

The first two witnesses for the defense testified, in substance, that they were near the crossing at the time the fight between the officers and the strikers occurred. Several shots were fired by parties on board the train, and before the train stopped. Neither of the witnesses saw anybody east of the crossing, nor did they hear or see any shooting from that direction.

R. H. Tucker testified, for the defense, that he heard Jim Courtright testify on the habeas corpus trial of the defendant, and that, on that trial, Courtright testified that Townsend was shot in the back, and that his, Townsend's, coat was powder burned. This witness testified, however, that he examined Townsend's body after it was brought back to Fort Worth. The ball entered the front of the body. There was coal dust on the back.

The defense closed.

The State introduced W. P. Thomas, who testified that he examined Townsend's body after it was brought back to Fort Worth. The ball entered Townsend's breast. The coat was not powder burned.

The motion for new trial raised the questions discussed in the opinion.

*M. D. Priest*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. An application for a change of venue, alleging the existence of such prejudice against the defendant as would prevent him from having a fair and impartial trial in Tarrant county, supported by the affidavit of three compurgating witnesses, was filed in this case. To controvert this, the State presented an affidavit, sworn to by thirteen citizens, attacking the

means of knowledge of the compurgators and denying the existence of such prejudice. This latter was supplemented by another affidavit, sworn to by six persons, covering the same ground of contest.

It is made to appear, by a bill of exceptions, that, after each of the three compurgators had been examined touching his means of knowledge and the existence of prejudice, the State called one Tucker, and asked him "if there was sufficient prejudice in Tarrant county to prevent a fair trial?" To this question the defendant objected, upon the ground that "the existence of prejudice was not in issue," and asked the court what was the issue to be determined, whereupon the court stated, in reply to said question, that "the means of knowledge of the compurgators was the issue to be determined, but that the court would overrule the objection and admit the evidence." This evidence was admissible as bearing upon the means of knowledge of the compurgators.

Respecting the application for a continuance, it is sufficient to say that, waiving the question of diligence, in the light of the subsequently developed testimony, the error in overruling the application—if error there was—became harmless, since the desired testimony was shown to be either immaterial or probably untrue.

The assignment of error with regard to the ruling that M. A. Chambers was a competent juror was not well taken. The bill of exceptions taken to the ruling does not show he either sat in the case or that he was peremptorily challenged by the defendant, and that an objectionable juror was forced upon him after his challenges were exhausted.

Upon the evidence, two theories of the homicide arose: The State's witnesses established a case wherein the appellant and those acting with him made an unlawful and deadly attack upon a sheriff's posse in the discharge of duty, of whom the deceased was one; part of the appellant's testimony went to show that the attack upon his party was begun by the posse, by the display and use of deadly weapons. If the State's version was the true one, the homicide resulting was murder of the first degree; the defendant's, if true—putting it in the light most favorable to him—showed a case of killing in self defense. Upon both these theories the instructions were full and fair; and the court was not required to charge upon either murder of the second degree or

manslaughter, since neither could legitimately arise upon the evidence.

Other grounds of exception have received like careful consideration as those discussed, and none of them are believed to be tenable. We find no error of law in the record.

Upon the facts there is still less room for question. If the other evidence had left the guilty complicity of the appellant in doubt, there still remained to confute and condemn him his own declarations and confessions, made to unimpeached witnesses and deposed to upon the trial. The judgment will be affirmed.

*Affirmed.*

Opinion delivered November 16, 1887.